IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

EDWARD WEHRENBERG,                             14-CV-1477

v.
                                                JURY TRIAL
METROPOLITAN PROEPRTY and                       DEMANDED
CASUALTY INSURANCE COMPANY,

## AMENDED COMPLAINT

AND NOW, comes the Plaintiff, Edward Wehrenberg, by and through counsel, David B. Chontos, of Chontos & Chontos, P.C., and files this following *Amended Complaint* against the defendant listed herein, of which the following is a statement:

1.   The Plaintiff, Edward Wehrenberg, (Hereinafter, "Wehrenberg") is an adult individual, who resides at 1801 Arlington Avenue, Pittsburgh, Pa 15210.

2.   The Defendant, Metropolitan Property and Casualty Insurance Company, (Hereinafter, "Metropolitan") is an insurance

1

company and a Rhode Island corporation.

3. Wehrenberg, owned a residential dwelling located at 226 Sheryl Lane, Pittsburgh, Pa 15221("226 Sheryl Lane"), which was insured by a homeowners insurance policy issued by Metropolitan. The policy, #532065490-0, which included coverage for renters is attached hereto as Exhibit A.

4. Metropolitan was acting by and through its authorized agents, servants, employees, managers, owners and/or staff throughout the entirety of this matter.

5. The 226 Sheryl Lane property was subject to a mortgage held by Wells Fargo Bank.

6. On or about October 27, 2011, Wehrenberg leased 226 Sheryl Lane to Alphonso Hyman. A standard form Pennsylvania residential lease was used. A copy of the lease is attached as Exhibit B. The lease agreement also allowed Hyman an option to purchase 226 Sheryl Lane.

7. Hyman was to rent 226 Sheryl Lane for 5 years. The first month was November, 2011. Hyman was to pay each month's rent directly to the mortgage company.

8. The option gave Hyman the right to purchase 226 Sheryl Lane upon payment of a fee of $30,000 by October 31, 2011. The option fee was paid to the mortgage company. The agreed upon final price upon full exercise of the option was $233,900 minus a credit of the initial payment of $30,000.

9. In early 2012, unbeknownst to Wehrenberg, Hyman stopped making his monthly rent payments.

10. Around June 2012, after receiving notice from the mortgage company that foreclosure proceedings had begun, Wehrenberg made numerous attempts to contact Hyman via telephone and e-mail.

11. When those attempts failed, Wehrenberg visited 226 Sheryl Lane around June 24, 2012.

12. Upon arrival, Wehrenberg noticed the locks had been changed and could not get inside despite his status as the landlord.

13. Wehrenberg peered through windows. What he saw was a surprise. Sheetrock had been removed from all the walls, the entire kitchen was removed, the first floor bathroom was no longer there, and the hardwood floors were removed as was the ceramic tile. In essence, the place was gutted done to the bare studs.

14. Wehrenberg immediately began to make efforts at contacting Hyman in any way he could.

15. A Hyman contact was made. A phone number was given to Wehrenberg to call. Wehrenberg called and talked with Hyman.

16. Wehrenberg told Hyman he did not have permission to gut the house or to do any work on 226 Sheryl Lane and that his property had been damaged as a result of his (Hyman's) acts.

17. Hyman told Wehrenberg there were major structural problems and so he took it upon his own to fix those problems and that he needed to gut the house to fix those problems.

18. Hyman told Wehrenberg that he would put the house back together because he was a contractor and could do that work.

19. Since the damage was already done by Hyman, Wehrenberg gave him the first chance to remedy the situation.

20. Wehrenberg told Hyman to get the mortgage caught up and to get the house put back together as soon as possible.

21. Hyman did bring the mortgage payments up to date including the payment of associated late fees.

22. Wehrenberg then began to contact Hyman each and every month to ensure monthly payments were being made and that he was making progress on getting the house put back together.

23. In January 2013, Wehrenberg noticed the rental payment was late and he contacted Hyman via telephone. Hyman assured Wehrenberg that payment would be made by January 15, 2013 and, he also added that the house was coming along.

24. When that tardy January payment was not made by Hyman, Wehrenberg made efforts to contact Hyman by phone and email. They were not successful.

25. Wehrenberg visited 226 Sheryl Lane again. This time he was able to get inside. He saw more damage. The second floor and the entire basement were pretty much gutted just like the first floor had been. Gone were more bathrooms, bedrooms, and closets. Wehrenberg also saw a new furnace and a new air conditioner.

26. The cost to replace what was damaged by Hyman is over $172,000.

27. Wehrenberg suffered a loss of rental income in excess of $100,800.

28. Wehrenberg suffered the loss of the subject property by eventual foreclosure of the home.

29. Wehrenberg suffered damage to his creditworthiness due to the inability to pay the monthly mortgage or rent the property.

30. On February 28, 2013, Wehrenberg filed a claim with Metropolitan. He sought coverage for the loss by virtue of the vandalism undertaken by Hyman.

31. Wehrenberg met with Metropolitan's adjuster soon thereafter. The adjuster took some pictures of the damage and threatened to leave the premises almost as soon as he entered 226 Sheryl Lane. He was short with Wehrenberg and said they would not cover the claim but admitted it was not his decision to make.

32. Metropolitan located Hyman. It took his statement regarding Wehrenberg's claim.

33. Hyman was found in prison awaiting the disposition of his federal drug charges.

34. It is believed that prior to taking Hyman's statement Metropolitan told Hyman that Wehrenberg had filed an insurance claim and the claim was for vandalism. The accusation from Metropolitan

that Hyman had committed the crime of vandalism was designed to incite and create animosity in Hyman towards Wehrenberg.  This then was a contributing factor to Hyman giving Metropolitan the ideal, yet manufactured, basis to deny payment of the claim.

35.   It is also believed that Metropolitan told Hyman that Wehrenberg's claim could be thwarted if Hyman had permission to remodel the interior of 226 Sheryl Lane.

36.   It is also believed that Metropolitan never told Hyman that regardless of insurance coverage or not, Hyman would ultimately be responsible for the damage he caused.

37.   It is also believed that Metropolitan knew that if they paid Wehrenberg's claim, they would have the right to sue Hyman but, the likelihood of recovery from a soon-to-be federal felon does not bode well for collectability purposes.  In essence, Hyman made himself judgment proof and Metropolitan manipulated the circumstances so as to gain maximum advantage of the situation.

38.   Wehrenberg called Metropolitan on numerous occasions about his claim.  He was pushed from 1 representative to the next. Many Wehrenberg calls went unreturned.

39. After several attempts to receive a copy of the insurance agreement, and after several months passed by, Wehrenberg finally got a copy of the policy.

40. Metropolitan subjected Wehrenberg to questioning on multiple occasions.

41. Metropolitan's investigator, believed to be Richard Pompeii, informed Wehrenberg that Hyman is a contractor and that he apparently misappropriated some tiles and other goods from other companies for his use and refused to pay for them.

42. It was from this investigator that Wehrenberg learned Hyman was in jail on drug charges.

43. Metropolitan failed to do any further investigation into Hyman's customers to discover if any 226 Sheryl Lane items ended up inside other clients' homes or businesses.

44. Instead, Metropolitan opted to believe everything Hyman said. They did no further investigation into the veracity of his statements and/or him and/or his business practices. For instance, Metropolitan discovered and shared with Wehrenberg information

about some ceramic tiles being hidden from a supplier by Hyman. Despite this circumstance, Metropolitan did nothing.

45. Metropolitan has refused to make a reasonable settlement offer and did so without conducting a reasonable investigation.

46. Metropolitan has not attempted to settle Wehrenberg's claim where liability is clear and Plaintiff's damages are ascertainable.

47. Metropolitan has made no offer of settlement in the months since the claim was made.

48. Metropolitan failed to define the term "vandalism" in its policy.

49. Metropolitan acknowledges there is no definition of vandalism contained within the policy.

50. In numerous conversations with Metropolitan agents, Wehrenberg has told them of a dictionary definition of vandalism and yet Metropolitan still does not adopt that definition.

51. Metropolitan has failed to negotiate with Wehrenberg in good faith on his claim.

52. The failure of Metropolitan to investigate Wehrenberg's claim demonstrates a purposeful, intentional, vexatious and bad faith policy on how it handles such homeowner based claims.

53. At no time did Metropolitan act in a manner consistent with the rights and interests of Wehrenberg.

54. Wehrenberg has complied with all conditions precedent under his policy of insurance with Metropolitan with respect to notifying and cooperating with Metropolitan.

55. Wehrenberg provided Metropolitan with all details of how, when and where the loss occurred.

56. Wehrenberg has taken reasonable steps to mitigate his losses by allowing Hyman the time to repair the damage he caused to 226 Sheryl Lane.

57. While it appears as if Metropolitan's investigation was completed within 3 months of the claim being filed, it took Metropolitan almost 7 months to officially deny the claim. This denial only came after several demands were made by Wehrenberg for a decision.

58. This purposeful late notification of the claim being denied has now allowed Metropolitan to claim protection from a contract

provision which appears to shorten the statute of limitations from the normal 4 years to 12 months.

59. Wehrenberg was also told by Attorney Patricia Moynihan that the suit would need to be filed within 1 year of the claim's denial because there is no action for anticipatory breach of a contract.

60. The claim denial letter was dated September 11, 2013.

61. An email accompanied the denial letter; the email says that "no delay in receiving this denial letter will be attributed to you". The author of that email was Attorney Patricia Moynihan.

62. At the time of the September 11th email, Ms. Moynihan was acting as both an expert and counsel for Metropolitan.

## COUNT ONE

## BREACH OF CONTRACT - Metropolitan

63. Wehrenberg incorporates paragraphs 1-64 as if repeated.

64. Wehrenberg had a written contract of insurance with Metropolitan to provide insurance against loss, which included a rider for renters.

65. Metropolitan was obligated to pay Wehrenberg for damages in the event of a loss. Metropolitan was also obligated to promptly, fairly and reasonably investigate Wehrenberg's claim.

66. Metropolitan breached its promise by acting in bad faith when Plaintiff's claim was not resolved promptly. Further, Metropolitan forced Plaintiff to litigate his claim, lacked a factual foundation to deny the claim, failed to adequately investigate the claim, and failed to reasonably communicate with Plaintiff regarding his claim.

67. Metropolitan did not possess a reasonable basis for delaying its investigation and processing of the claim and eventual denial of the claim, all of which then forced Plaintiff to litigate his claim.

68. Metropolitan knew of and intentionally and/or recklessly disregarded its lack of a reasonable basis for delaying its investigation and processing of Plaintiff's claims.

69. Metropolitan breached its promise and acted in bad faith as follows:

   a. By failing to make a reasonable offer of settlement;

b. By failing to acknowledge and/or act promptly upon written or oral communications with respect to the claim;

c. By not attempting to effectuate the prompt, fair and equitable settlement of the claim;

d. By having a policy of not offering fair settlements to insureds who have homeowner claim loss;

e. By compelling Wehrenberg to institute litigation to recover for his losses covered under said policy of homeowners;

f. By engaging in wrongful and deceptive conduct which created confusion and misunderstanding in the resolution of the claim, including, but not limited to, delaying the processing and/or the investigation of the said claim in excess of 18 months.

g.  By making false statements with knowledge of their falsity through their agent, relating to the progress of defendants investigation of the claim, including making Wehrenberg undergo two examinations regarding the

   facts of the claim and promising him updates on the investigation;

  h. By engaging in the practice of ignoring his phone calls to resolve his claim in a prompt fashion,

70.  The breaking of these promises by Metropolitan has caused damage.  Wehrenberg has suffered compensatory damages, including, but not limited to, loss of compensation for his damages to the subject property, loss of income, and a negative impact on his credit worthiness.

71.  The damages are greater than $75,000.

WHEREFORE, the Plaintiff requests judgment be entered in his favor and against the Defendant in an amount greater than $75,000 plus costs.

COUNT TWO

BAD FAITH - Metropolitan

72.  Plaintiff incorporates paragraphs 1-73 as if repeated.

73.  Pursuant to 42 Pa. C.S. § 8371 (1), Plaintiff is entitled to an award of interest on the amount of the claim which he has made against the homeowners insurance policy issued him by Metropolitan from the date on which the claim for damage/loss reimbursement was

made, punitive damages pursuant to Section 8371(2), court costs, and attorney's fees, if any, under section 8371(3).

74. Metropolitan and/or those acting on its behalf as representatives, agents, employees or servants, have engaged in frivolous, arbitrary and capricious conduct constituting an unfound refusal to remit to Plaintiff the monies due him under the said homeowners policy, thereby forcing a lawsuit.

75. Metropolitan did not possess a reasonable basis for failing to pay Wehrenberg the monies due and owing him.

76. Metropolitan failed to properly investigate the claim for his loss under the insurance policy, purposely delayed their investigation and processing of the underlying claim, and forced Wehrenberg to litigate in order to collect what is justly due him.

77. Metropolitan knew of and/or recklessly disregarded their lack of a reasonable basis in denying his claim, failing to properly investigate the claim and forcing him into litigation.

78. Metropolitan has acted in bad faith toward Wehrenberg as follows:

    a. By failing to make reasonable offer of settlement;

b. By failing to acknowledge and/or act promptly upon written or oral communications with respect to the claim;

c. By not attempting in good faith to effectuate the prompt, fair and equitable settlement of the claim in which the liability is clear;

d. By having a policy of not offering fair settlements to insureds who have homeowner claim loss;

e. By compelling Wehrenberg to institute litigation to recover for his losses covered under said policy of homeowners;

f. By failing to provide a reasonable written explanation for the delays in processing, investigating and resolving his claims, and failing to provide written notification concerning when a decision on the claim could be expected;

g. By engaging in wrongful and deceptive conduct which created confusion and misunderstanding in the resolution of the claim, including, but not limited to, not offering a fair and reasonable settlement amount for the claim and

       delaying the processing and/or the investigation of the said claim in excess of 18 months.

  h. By making false statements with knowledge of their falsity through their agent, relating to the progress of defendants investigation of the claim, including making Wehrenberg undergo two examinations regarding the facts of the claim and promising him updates on the investigation;

  i. By engaging in the practice of ignoring his phone calls to resolve his claim in a prompt fashion, including making him push for a copy of the denial letter after several calls;

  j. By intentionally telling Wehrenberg that his statute date was 1 year from the date of the denial letter.

  k. By failing to investigate the business dealings of Hyman after being put on notice that he had hidden goods from a supplier

79. The damages sustained by Wehrenberg amounts to over $172,000, as that is the cost to repair 226 Sheryl Lane.

80.  The actions of Metropolitan showed a reckless indifference towards his right to recover for his losses under the insurance policy issued by Metropolitan.

81.  Because of the bad faith of the defendant, Metropolitan, Wehrenberg claims statutory damages in Section 8371, as follows:

    a. Interest on his claims in an amount equal to the prime rate of interest plus three percent for the period of February 28, 2013 to the date of settlement or settlement pursuant to § 8371 (1);

    b. Punitive damages pursuant to § 8371 (2); and

    c. Court costs and attorney fees pursuant to § 8371 (3).

WHEREFORE, Wehrenberg requests this Court enter judgment in his favor and against Metropolitan in an amount greater than the $75,000.00, plus interest, punitive damages, court costs and counsel fees.

Respectfully submitted,

/s/David B. Chontos
*PA I.D. # 53442*
CHONTOS & CHONTOS, P.C.
561 Beulah Road
Turtle Creek,  PA  15145-1317
412 825 5450
412 825 5451 *fax*
david@chontoslaw.com

Counsel for Plaintiff

Dated : April 21, 2015