# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD WEHRENBERG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:14-cv-01477 |
| v. ) | |
| ) | Judge Mark R. Hornak |
| METROPOLITAN PROPERTY AND ) | |
| CASUALTY INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

This Opinion marks the second stop along the way for the insurance coverage case of Plaintiff, Edward Wehrenberg ("Wehrenberg").

In its first Opinion related to this action, ECF No. 35, 2015 WL 1643043, the Court denied Wehrenberg's Motion for Joinder of an Additional Defendant that would have destroyed this Court's diversity jurisdiction and necessitated a remand to state court, and, consequently, the Court denied Wehrenberg's Motion to Dismiss for Lack of Jurisdiction.

Since that Opinion, a few things have happened: Wehrenberg refiled his Amended Complaint with all references to Alphonso Hyman (the would-be defendant) stricken as ordered (ECF No. 37); the Defendant, Metropolitan Property and Casualty Insurance Company ("Metropolitan"), filed a Motion to Dismiss Wehrenberg's Amended Complaint and supporting brief (ECF Nos. 42–43) in which it reasserts most (but not all) of the arguments it made in its earlier Motion for Judgment on the Pleadings (ECF No. 13); and Wehrenberg's lawyer, David B. Chontos, has withdrawn from the case, leaving Wehrenberg (a lawyer himself and a member of

the Bar of this court) at the wheel (ECF Nos. 38 & 45). For the reasons stated in this Opinion, the Court will deny Metropolitan's Motion to Dismiss.

## I. BACKGROUND

The Court set forth the facts (as Wehrenberg continues to plead them) in its prior Opinion, which are, in essence, as follows:

> [Wehrenberg] owned a house located at 226 Sheryl Lane, Pittsburgh, Pa 15221("226 Sheryl Lane"), which was insured by a homeowners insurance policy issued by Metropolitan. 226 Sheryl Lane was subject to a mortgage held by Wells Fargo. In October 2011, Wehrenberg leased 226 Sheryl Lane to Alphonso Hyman. Under the agreement, Hyman was to lease 226 Sheryl Lane for five years starting in November, 2011, and Hyman was to pay each month's rent directly to the mortgage company. An option in the lease gave Hyman the right to purchase 226 Sheryl Lane by doing this.
>
> In early 2012, Hyman stopped making his monthly rent payments, and around June 2012 Wehrenberg received notice from the mortgage company that foreclosure proceedings had begun. Wehrenberg called and emailed Hyman unsuccessfully and so he visited 226 Sheryl Lane around June 24, 2012, where he found that the locks had been changed. Wehrenberg looked through the windows and saw that "[i]n essence, the place was gutted done [*sic*] to the bare studs." Wehrenberg was then able to get ahold of Hyman on the phone (the next day) and told him that he (Hyman) did not have permission to gut the house or to do any work on 226 Sheryl Lane and that the property had been damaged. Hyman responded that he was a contractor, that the house had major structural problems that he had decided to fix and which required him to gut the house, and that he would put the house back together.
>
> Wehrenberg did not notify Metropolitan of this turn of events, but instead he allowed Hyman to continue his "work" on the property. Wehrenberg told Hyman to get the mortgage caught up and to get the house put back together as soon as possible, which Hyman did. In January 2013, Wehrenberg noticed that a rental payment was late and called Hyman, who assured Wehrenberg that payment would be made by January 15, 2013 and that the house was coming along. But Hyman never made the payment. Wehrenberg called Hyman again but found that the phone was disconnected, so Wehrenberg went to 226 Sheryl Lane and found not only that the first floor was in the same disassembled condition but that the basement and second floor had been gutted also. Three bathrooms, flooring, bedroom walls, closets, furnaces, and air conditioner had all been removed. The furnaces and air conditioners had, however, been replaced.
>
> On February 28, 2013, Wehrenberg filed a claim with Metropolitan, asserting that the property had been vandalized. Wehrenberg says that the Metropolitan

2

adjuster came out to take pictures of the damages and "threatened to leave the premises" almost immediately, told Wehrenberg that Metropolitan would not cover the claim, and was "short" with him (Wehrenberg). After that, Wehrenberg says he called Metropolitan regarding his claim but was "pushed from agent to agent and many times his phone calls were not returned." Wehrenberg eventually lost the house to foreclosure (though no foreclosure date was included in either the Complaint or the Amended Complaint). Metropolitan has never made an offer of settlement under the policy.

*Wehrenberg v. Metro. Prop. & Cas. Ins. Co.*, No. 14-1477, 2015 WL 1643043, at *1–3 (W.D. Pa. Apr. 9, 2015) (record citations omitted).

Earlier in this action, Metropolitan filed a Motion for Judgment on the Pleadings (ECF No. 13), which was fully briefed and then argued on February 4, 2015. Things went off the rails at oral argument when the Court proceeded down a line of questioning regarding a suit limitations clause in the Policy at issue, which had been raised by Metropolitan in its Motion for Judgment on the Pleadings. *See* ECF No. 29, at 10–14. Then-counsel for Wehrenberg argued for the first time that Metropolitan had waived its ability to assert the suit limitations clause and requested leave to amend the Complaint in order to allege facts in support of that waiver argument. *Id.* The Court granted Plaintiff's oral motion (reluctantly). Thereafter, Wehrenberg filed an Amended Complaint,[1] and Metropolitan filed the pending Motion to Dismiss (ECF No. 42) in which it put forth the same arguments in a brief that was nearly identical to the one that it filed in support of its earlier Motion for Judgment on the Pleadings, with one big difference: its argument with respect to the suit limitations clause had been dropped.

The Court has reviewed the Defendant's Motion to Dismiss (ECF No. 42) and supporting brief (ECF No. 43), both of Plaintiff's Responses to the Defendant's Motion (ECF Nos. 47 and 50), the Defendant's Reply brief (ECF No. 56), and all other related materials. The Court heard

---

[1] Wehrenberg also filed a Motion for Joinder of Additional Defendant and a Motion to Dismiss for Lack of Jurisdiction, both of which were addressed in the Court's previous Opinion in this case. *Wehrenberg*, 2015 WL 1643043.

3

oral argument on the Defendant's earlier Motion for Judgment on the Pleadings (ECF No. 13), a Motion that was, in essence, the same as the current Motion to Dismiss.[2]

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). In short, a motion to dismiss should be granted if a party does not allege facts which could, if established at trial, entitle him to relief. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. DISCUSSION

### A. Breach of Contract

Metropolitan says that Wehrenberg bears the burden of demonstrating that his loss falls within the Policy coverage terms, ECF No. 43, at 9 (citing *Erie Insurance Exchange v. Transamerica Insurance Company*, 533 A.2d 1363, 1366 (Pa. 1987)), and that Wehrenberg has failed to demonstrate that this loss is so covered.

"In Pennsylvania, the insured bears the burden of proving facts that bring its claim within the policy's affirmative grant of coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996).[3] But "the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense." *Id.* Exclusions must be construed narrowly against the insurer. *Estate*

---

[2] As noted, there is one key difference between the Defendant's Motion for Judgment on the Pleadings (ECF No. 13) and the present Motion, which is that the former Motion alleged that the Plaintiff's claims were barred by a suit limitation clause contained with the policy. *See* ECF No. 13 at ¶¶ 42-48; ECF No. 14, at 13-15. The Defendant dropped that argument between the filing of the two Motions.

[3] The parties appear to agree that Pennsylvania law governs this dispute.

4

*of O'Connell ex rel. O'Connell v. Progressive Ins. Co.,* 79 A.3d 1134, 1140 (Pa. Super. Ct. 2013). As to the interpretation of insurance contracts, our Court of Appeals has explained Pennsylvania law in this regard as follows:

> The interpretation of an insurance contract is a question of law that is properly decided by the court. *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 469 A.2d 563, 566 (Pa. 1983). In determining whether a contract is ambiguous, the court must examine the questionable term or language in the context of the entire policy and decide whether the contract is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Gamble Farm Inn, Inc. v. Selective Ins. Co.,* 656 A.2d 142, 143–44 (Pa. Super. Ct. 1995) (quoting *Hutchison v. Sunbeam Coal Corp.,* 519 A.2d 385, 390 (Pa. 1986)). Where a provision of a policy is ambiguous, the provision should be construed in favor of the insured and against the insurer, the drafter of the agreement. *Standard Venetian Blind,* 469 A.2d at 566. If, however, the terms of the policy are clear and unambiguous, the general rule in Pennsylvania is to give effect to the plain language of the agreement. *Bensalem Tp. v. International Surplus Lines Ins. Co.,* 38 F.3d 1303, 1309 (3d Cir. 1994).

*Reliance Ins. Co. v. Moessner,* 121 F.3d 895, 900–01 (3d Cir. 1997), *as amended* (Aug. 28, 1997).

The Policy involved in this case includes the following relevant provisions:

## THE POLICY
## CAUSES OF PROPERTY LOSS
### SECTION I –LOSSES WE COVER
(Special Perils)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### COVERAGE A – DWELLING AND COVERAGE B – PRIVATE STRUCTURES

**We** will pay for sudden and accidental direct physical loss or damage to the property described in Coverages A and B, except as excluded in **SECTION I – LOSSES WE DO NOT COVER.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### SECTION I – BROAD NAMED PERILS

Whenever Broad Named Perils is referred to in this policy, the following causes of loss will apply for sudden and accidental direct physical loss.

5

Under the names perils below, **we** do not cover loss or damage, no matter how caused, to the property which results directly or indirectly from **fungus and mold**. There is no coverage for loss which, in whole or in part, arises of, is aggravated by, contributed to by acts or omissions of persons, or results from **fungus and mold**. This exclusion applies regardless of whether **fungus and mold** arises from any other cause of loss, including, but not limited to a loss involving water, water damage or discharge, which may be otherwise covered by this policy, except as granted under **SECTION I – ADDITIONAL COVERAGES for Fungus and Mold Remediation.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

8. **Vandalism or Malicious Mischief**
**We** do not pay for any loss caused by any act committed in the course of the vandalism or malicious mischief including any ensuing loss or fire if the residence was vacant for more than 30 consecutive days immediately prior to the loss. A **residential premises** being constructed is not considered vacant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## SECTION I – LOSSES WE DO NOT COVER

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

2. **We** do not insure under any coverage for any loss consisting of one or more of the items below. However, we pay for any ensuing loss unless the ensuing loss is itself excluded by any other provision in this policy. Further, **we** do not insure for loss describedinExclusion1.above and Exclusion 3. below regardless of whether one or more of the items below(a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss. The items are:

    A. conduct, act, failure to act, or decision of any person, group, organization or governmental body whether intentional, wrongful, negligent or without fault;
    B. defective, inadequate, faulty or unsound:
        1. planning, zoning, development, surveying, siting;
        2. design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
        3. materials used in repair, construction, renovation or remodeling; or
        4. maintenance;
        of any property whether on or off the **residence premises**. Property includes land, structures or improvements of any kind; and
    C. weather conditions.

ECF No. 43, at 7–8; ECF No. 37-1, at 18–19, 21–22.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Metropolitan makes two arguments for why Wehrenberg's claim is not covered by this Policy as a matter of law. First, Metropolitan says that Wehrenberg has failed to carry his burden of pleading that his loss falls within the Policy because he has not averred facts from which it could be shown that his loss could be considered "vandalism or malicious mischief."

6

ECF No. 43, at 8–12. Second, Metropolitan says that the "loss" alleged by Wehrenberg, a loss that Wehrenberg has characterized as vandalism, is not actually vandalism at all but instead an incomplete renovation, which is subject to an exclusion in the Policy and therefore not covered. *Id.* at 12–14.

Metropolitan's arguments fail for a number of reasons. First of all, Metropolitan has failed to demonstrate that the facts as alleged in the Amended Complaint could never be "vandalism or malicious mischief." Metropolitan acknowledges that "[t]here seems to be a dearth of case law in Pennsylvania addressing vandalism claims," and also that the term "vandalism" is not even defined in the policy at issue, but Metropolitan nevertheless argues that "[i]t is unfathomable to interpret the facts set forth in this Complaint as 'vandalism.'" *Id.* at 9, 12.

The Court disagrees. According to the Amended Complaint, when Wehrenberg went to 226 Sheryl Lane in late June 2012, he peered through the windows and saw that sheetrock had been removed from the walls, the kitchen and first floor bathroom had been removed, and the hardwood floors and ceramic tile had been removed. ECF No. 37, at ¶ 13. At that point, Wehrenberg did not make a claim under the Policy with Metropolitan, but he chose instead to give Hyman "the first chance to remedy the situation," and thus told Hyman "to get the mortgage caught up and to get the house put back together as soon as possible." *Id.* at ¶¶ 19–20. If the facts stopped there, Metropolitan would perhaps have a winning argument under the theory of acquiescence. *Quaker City Gun Club v. St. Paul Fire & Marine Ins. Co.*, No. 84-6327, 1986 WL 3561, at *4 (E.D. Pa. Mar. 13, 1986) ("Nevertheless, where the party whose property is damaged acquiesces in the act that causes the damage, malice cannot be implied from the act itself."). In other words, if Wehrenberg's Amended Complaint relied solely on the initial house-gutting by Hyman, Metropolitan might be right. The reason for this is that, even according to his own

7

Amended Complaint, Wehrenberg acquiesced in Hyman's activities on the property and failed to make a claim to Metropolitan.

But the next set of alleged facts in the Amended Complaint provides a plausible basis for Wehrenberg's claim. After instructing Hyman to repair the damage to 226 Sheryl Lane, Wehrenberg returned to the property again in early 2013[4] and found additional damage done: "The second floor and the entire basement were pretty much gutted just like the first floor had been. Gone were more bathrooms, bedrooms, and closets." *Id.* at ¶¶ 24–25.[5] The Amended Complaint then states that Wehrenberg filed a claim with Metropolitan on February 28, 2013. *Id.* at ¶ 30. Thus, it is certainly plausible that he did not acquiesce in this second incident in which Hyman removed even more elements from 226 Sheryl Lane without Wehrenberg's permission. After the first incident, Wehrenberg told Hyman to put the house back together. Hyman didn't do that. Instead, he gutted more of the house without Wehrenberg's permission and contrary to Wehrenberg's direction. The Court cannot say at this point, as a matter of law, that such actions could not constitute vandalism or malicious mischief under the Policy. What took place may or may not have been vandalism, but it's just too soon to tell.

Further, Metropolitan has pointed to no applicable law that stands for the proposition that vandalism could never be found under facts such as alleged here. Metropolitan acknowledges that there is "a dearth of case law in Pennsylvania addressing vandalism claims" and then cites to

---

[4] One may wonder why Wehrenberg waited six (6) months to "check up" on Hyman, and to see whether Hyman had restored the damage as he had been directed. While that oddity may raise a question (or two) as to what the entire background is to this tale, discovery can flesh out the nuances of the relationship between the Plaintiff and Mr. Hyman, along with the various twists and turns of the facts involved in this case.

[5] Wehrenberg is careful to note that he "also saw a new furnace and a new air conditioner" upon that second visit, which suggests that Hyman was performing renovations on the house, not merely vandalizing it—but this fact is not enough on its own to provide a basis for dismissing the Amended Complaint. The Court cannot say as a matter of law that vandalism of a property is automatically converted into renovations merely because a furnace and air conditioner are installed: it could still be vandalism when the rest of the home's interior has been removed allegedly contrary to a specific direction not to do so.

8

various district court cases in support of its unavailing argument that the facts as alleged here could never be considered vandalism. ECF No. 43, at 9–12. But none of the cases cited stands for a rule of law that the facts in Wehrenberg's case could *never* be vandalism. Rather, in *Quaker City* (the case principally relied upon by Metropolitan), the court concluded that "Pennsylvania courts would liberally interpret vandalism or malicious mischief coverage to include losses proximately caused by an act that was in conscious or intentional disregard of the rights of another" and that therefore:

> recovery may be available under a vandalism or malicious mischief policy even if the vandal did not specifically intend to bring about the particular damage actually caused and even if the vandal did not act out of ill will toward anyone in committing the wrongful act that ultimately caused the damage.

*Id.* at *4. In response, Wehrenberg points to another case addressing an insurance policy provision for "vandalism or malicious mischief" in which the court concluded that, in order to establish coverage under such a policy, a plaintiff must prove by a preponderance of the evidence that: "[1] An intentional act was done by some known or unknown person; [2] This act was done in conscious or intentional disregard of the rights of others in the property; [and] [3] The act was the proximate cause of damage to the insured property." *Grabowski v. Agric. Ins. Co.*, 675 F. Supp. 279, 280 (E.D. Pa. 1987).

The available authority thus appears to contradict Metropolitan's argument. Here, the facts plausibly show that Hyman committed a wrongful act (according to the Amended Complaint, after being told not to do so, Hyman gutted 226 Sheryl Lane without Wehrenberg's permission and in contravention of the lease agreement between them) in conscious or intentional disregard for Wehrenberg's rights. These acts allegedly were the proximate cause of considerable damage to Wehrenberg. *See* ECF No. 37, at ¶¶ 26–29. And, perhaps most importantly, Wehrenberg does not allege facts tending to show that he acquiesced in the final

9

acts of Hyman. The fact that Wehrenberg acquiesced in the first set of actions taken by Hyman does not mean that he necessarily acquiesced in the second set, especially when he specifically pleads that he told Hyman to not do exactly what he did do.

For these same reasons, the Court cannot say that the actions taken by Hyman were necessarily subject to the Policy's exclusion for renovations or remodeling. While it is true that Wehrenberg arguably acquiesced in the initial damage done to 226 Sheryl Lane by allowing Hyman to continue to perform work on the property, the scope of that acquiescence was limited to repairing the damage that had already been done and was not, at least according to the Amended Complaint, intended to confer on Hyman the right to gut the basement and second floors of the property. Thus, the further damage done to the property was not necessarily renovation gone wrong—it could plausibly have been vandalism. Therefore, the Court is not persuaded by Metropolitan's second argument as to why the breach of contract claim in the Amended Complaint should be dismissed.[6] For these reasons, the Court will deny Metropolitan's Motion to Dismiss Wehrenberg's Amended Complaint.

### B. Bad Faith

Metropolitan's argument for why Wehrenberg's bad faith claim must be dismissed depends on its previous argument that there is no coverage. Their argument in this regard states as follows:

> Numerous courts have held that under Pennsylvania law, in the absence of insurance coverage, there can be no bad faith by the insurer as a matter of law. *Lucker Manufacturing v. The Home Ins. Co.*, 23 F.3d 808, 821 (3rd Cir. 1994); *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 (3rd Cir. 1999) ("bad faith claims cannot survive a determination that there was no duty to defend, because the court's determination that there was no potential coverage means that the insurer had good cause to refuse to defend"). An insurer cannot commit bad faith as a matter of law when no coverage existed in the first place.

---

[6] It is also worth noting that the burden for establishing the applicability of an exclusion for renovations rests with Metropolitan, since an exclusion is an affirmative defense. *Koppers*, 98 F.3d at 1446.

10

Furthermore, if no coverage existed, then an insurer acted reasonably in not providing coverage. In the present case, no coverage existed; therefore, Plaintiff's bad faith claim must be dismissed with prejudice.

ECF No. 43, at 14–15.

Because the Court has concluded that Wehrenberg's Amended Complaint states a plausible breach of contract claim (i.e., the Court has not concluded as a matter of law that no coverage existed for Wehrenberg's insurance claim for vandalism), Metropolitan's argument with respect to bad faith fails. The Motion to Dismiss will therefore be denied as to bad faith also.

## IV. **CONCLUSION**

For the reasons stated in this Opinion, Defendant's Motion to Dismiss Amended Complaint (ECF No. 42) is denied.

An appropriate Order will follow.

Mark R. Hornak
United States District Judge

Dated: August 7, 2015
cc: All counsel of record