IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD WEHRENBERG, | ) |
| Plaintiff, | ) 2:14-cv-01477 |
| v. | ) Judge Mark R. Hornak |
| METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY, | ) |
| Defendant. | ) |

## OPINION

**Mark R. Hornak, United States District Judge**

This is the third Opinion in Plaintiff's insurance coverage case. Plaintiff's Amended Complaint, ECF No. 37, contains two counts: one for breach of contract and one for bad faith denial of insurance coverage. Previously, the Court denied Plaintiff's Motion for Joinder of an Additional Defendant, ECF No. 35, *Wehrenberg v. Metro. Prop. & Cas. Ins. Co.*, No. 2:14-CV-01477, 2015 WL 1643043 (W.D. Pa. Apr. 9, 2015), and Defendant's Motion to Dismiss, ECF No. 57, *Wehrenberg v. Metro. Prop. & Cas. Ins. Co.*, No. 2:14-CV-01477, 2015 WL 4716305 (W.D. Pa. Aug. 7, 2015). Now pending before the Court is Defendant's Motion for Summary Judgment, ECF No. 81. For the reasons which follow, Defendant's Motion is granted as to both Counts I and II, and summary judgment is entered in favor of the Defendant.

I. **BACKGROUND**

The Court has twice before recounted the facts in this case. In summary, they are as follows:

> Wehrenberg owned a house located at 226 Sheryl Lane, Pittsburgh, Pa 15221 ("226 Sheryl Lane"), which was insured by a homeowners insurance policy issued by Metropolitan. 226 Sheryl Lane was subject to a mortgage held by Wells Fargo. In October 2011, Wehrenberg leased 226 Sheryl Lane to Alphonso Hyman. Under

the agreement, Hyman was to lease 226 Sheryl Lane for five years starting in November, 2011, and Hyman was to pay each month's rent directly to the mortgage company. An option in the lease gave Hyman the right to purchase 226 Sheryl Lane by doing this.

In early 2012, Hyman stopped making his monthly rent payments, and around June 2012 Wehrenberg received notice from the mortgage company that foreclosure proceedings had begun. Wehrenberg called and emailed Hyman unsuccessfully and so he visited 226 Sheryl Lane around June 24, 2012, where he found that the locks had been changed. Wehrenberg looked through the windows and saw that "in essence, the place was gutted done [sic] to the bare studs." Wehrenberg was then able to get ahold of Hyman on the phone (the next day) and told him that he (Hyman) did not have permission to gut the house or to do any work on 226 Sheryl Lane and that the property had been damaged. Hyman responded that he was a contractor, that the house had major structural problems that he had decided to fix and which required him to gut the house, and that he would put the house back together.

Wehrenberg did not notify Metropolitan of this turn of events, but instead he allowed Hyman to continue his "work" on the property. Wehrenberg told Hyman to get the mortgage caught up and to get the house put back together as soon as possible, which Hyman did. In January 2013, Wehrenberg noticed that a rental payment was late and called Hyman, who assured Wehrenberg that payment would be made by January 15, 2013 and that the house was coming along. But Hyman never made the payment. Wehrenberg called Hyman again but found that the phone was disconnected, so Wehrenberg went to 226 Sheryl Lane and found not only that the first floor was in the same disassembled condition but that the basement and second floor had been gutted also. Three bathrooms, flooring, bedroom walls, closets, furnaces, and air conditioner had all been removed. The furnaces and air conditioners had, however, been replaced.

On February 28, 2013, Wehrenberg filed a claim with Metropolitan, asserting that the property had been vandalized. Wehrenberg says that the Metropolitan adjuster came out to take pictures of the damages and "threatened to leave the premises" almost immediately, told Wehrenberg that Metropolitan would not cover the claim, and was "short" with him (Wehrenberg). After that, Wehrenberg says he called Metropolitan regarding his claim but was "pushed from agent to agent and many times his phone calls were not returned." Wehrenberg eventually lost the house to foreclosure (though no foreclosure date was included in either the Complaint or the Amended Complaint). Metropolitan has never made an offer of settlement under the policy.

*Wehrenberg v. Metro. Prop. & Cas. Ins. Co.*, No. 2:14-CV-01477, 2015 WL 4716305, at *1–2

(W.D. Pa. Aug. 7, 2015) (internal citations and alterations omitted).

On May 20, 2016, Defendant filed a Motion for Summary Judgment. The Court has considered all of the parties' papers and held oral argument on the Motion on August 30, 2016.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Furthermore, to evaluate a motion for summary judgment, the Court must "view[] the evidence in the light most favorable to the nonmoving party and draw[] all inferences in favor of that party." *Schock v. Baker*, No. 16-1678, 2016 WL 6276048, at *2 (3d Cir. Oct. 27, 2016) (citing *Kaucher v. County of Bucks*, 455 F.3d 418, 422–23 (3d Cir. 2006)). Under Rule 56, an issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The Court may consider all of the materials in the record, Fed. R. Civ. P. 56(c)(3), including "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III. DISCUSSION

### A. Breach of Contract

In this case, both parties agree that Pennsylvania law applies. ECF No. 82 at 6; ECF No. 88 at 2. "In Pennsylvania, the insured bears the burden of proving facts that bring its claim within the policy's affirmative grant of coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir.1996). However, "the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the

basis of an exclusion is an affirmative defense." *Id.* Additionally, as the Court explained in its second Opinion in this case, the Third Circuit has stated:

> The interpretation of an insurance contract is a question of law that is properly decided by the court. *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (Pa.1983). In determining whether a contract is ambiguous, the court must examine the questionable term or language in the context of the entire policy and decide whether the contract is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Gamble Farm Inn, Inc. v. Selective Ins. Co.*, 440 Pa.Super. 501, 656 A.2d 142, 143–44 (Pa.Super.Ct.1995) (quoting *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 390 (Pa.1986)). Where a provision of a policy is ambiguous, the provision should be construed in favor of the insured and against the insurer, the drafter of the agreement. *Standard Venetian Blind*, 469 A.2d at 566. If, however, the terms of the policy are clear and unambiguous, the general rule in Pennsylvania is to give effect to the plain language of the agreement. *Bensalem Tp. v. International Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir.1994). *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900–01 (3d Cir.1997), as amended (Aug. 28, 1997).

*Wehrenberg*, 2015 WL 4716305 at *3.

The insurance policy ("Policy") that the Court will be examining in this case includes the following relevant provisions:

## THE POLICY
## CAUSES OF PROPERTY LOSS
### SECTION I –LOSSES WE COVER
(Special Perils)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### COVERAGE A – DWELLING AND COVERAGE B – PRIVATE STRUCTURES

**We** will pay for sudden and accidental direct physical loss or damage to the property described in Coverages A and B, except as excluded in **SECTION I – LOSSES WE DO NOT COVER.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### SECTION I – BROAD NAMED PERILS

Whenever Broad Named Perils is referred to in this policy, the following causes of loss will apply for sudden and accidental direct physical loss.

4

Under the names perils below, **we** do not cover loss or damage, no matter how caused, to the property which results directly or indirectly from **fungus and mold**. There is no coverage for loss which, in whole or in part, arises of, is aggravated by, contributed to by acts or omissions of persons, or results from **fungus and mold**. This exclusion applies regardless of whether **fungus and mold** arises from any other cause of loss, including, but not limited to a loss involving water, water damage or discharge, which may be otherwise covered by this policy, except as granted under **SECTION I – ADDITIONAL COVERAGES for Fungus and Mold Remediation.**

***************

8.  **Vandalism or Malicious Mischief**
**We** do not pay for any loss caused by any act committed in the course of the vandalism or malicious mischief including any ensuing loss or fire if the residence was vacant for more than 30 consecutive days immediately prior to the loss. A **residential premises** being constructed is not considered vacant.

***************

## SECTION I – LOSSES WE DO NOT COVER

***************

2.  **We** do not insure under any coverage for any loss consisting of one or more of the items below. However, we pay for any ensuing loss unless the ensuing loss is itself excluded by any other provision in this policy. Further, **we** do not insure for loss describedinExclusion1.above and Exclusion 3. below regardless of whether one or more of the items below(a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss. The items are:

    A. conduct, act, failure to act, or decision of any person, group, organization or governmental body whether intentional, wrongful, negligent or without fault;
    B. defective, inadequate, faulty or unsound:
    　　1. planning, zoning, development, surveying, siting;
    　　2. design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
    　　3. materials used in repair, construction, renovation or remodeling; or
    　　4. maintenance;
    　　of any property whether on or off the **residence premises**. Property includes land, structures or improvements of any kind; and
    C. weather conditions.

ECF No. 43, at 7–8; ECF No. 37-1, at 18–19, 21–22 (emphasis in original).

Here, Defendant claims that there is no issue of material fact, and that the Policy has not been breached as a matter of law for three reasons: (1) Plaintiff cannot establish that the claimed loss is covered as "sudden and accidental direct physical loss or damage" under the terms of the involved Policy, (2) even if the loss is covered, Plaintiff's failure to immediately notify Defendant of the damage prejudiced Defendant and (3) the damages claimed are explicitly

excluded from coverage under the Policy. The Court will examine each of these arguments in turn.

First, the Court concludes that Plaintiff cannot, on the record before the Court, meet his burden of proving that his loss is covered by his Policy in the first instance. The Policy specifically provides that Defendant will only cover "sudden *and* accidental direct physical loss or damage to [Plaintiff's] property." ECF No.37-1 at 18 (emphasis added). Under Pennsylvania law, "sudden and accidental" "mean[], respectively, 'abrupt' and 'unexpected or unintended.'" *U.S. Fire Ins. Co. v. Kelman Bottles*, 538 F. App'x 175, 181 (3d Cir. 2013). Additionally, "the relevant question is whether the nature of the loss, and not its underlying cause, was 'sudden and accidental.'" *Id.* In this case, the Court concludes that no reasonable jury could find that Plaintiff's loss was "sudden." In his uncontradicted deposition testimony, Plaintiff's tenant, Hyman, explained that his lease began in November 2011, ECF No. 84-2 at 34:17-34:19, and that by the middle of December 2011, a structural engineer had examined the house. *Id.* at 44:2-44:5. Hyman further stated that he received the engineer's report by the end of December 2011, *id.* at 44:11-44:14, and that "demo was done by January [2012] at the latest." *Id.* at 59:24-59:25. From January 2012 to January 2013, Hyman was "actually in the phase of putting the house back together." *Id.* at 61:16-61:17; *see also id.* at 60:11-60:13. Although it is unclear from his testimony if Hyman waited to begin demolishing the house until he received the engineer's report, viewing the facts in the light most favorable to Plaintiff, the Court will assume that he did so wait. Even accounting for such a delay, the demolition would still have taken from the end of December 2011 until sometime in January 2012—a time span of about a month. No reasonable jury could find that such "damage," incurred over such a lengthy time period, was "sudden."

Although Plaintiff's perception of the loss may have been sudden, the nature of it was not.[1] *Cf. Capriotti v. Allstate Prop. & Cas. Ins. Co.*, No. CIV.A. 11-7779, 2012 WL 3887043, at *3 (E.D. Pa. Sept. 6, 2012) (denying summary judgment because it was possible that a jury could conclude water damage occurred over the course of one day and was therefore sudden).

Because Plaintiff's Policy states that physical damage is only covered when it is both "sudden" *and* "accidental," the Court's conclusion that the damage could not be found to be "sudden" is enough to preclude coverage in this case. However, even if Plaintiff's loss could be deemed "sudden," it would still not be covered by the Policy because no reasonable jury could find that Plaintiff's loss was "accidental," meaning "unexpected or unintended." *U.S. Fire Ins. Co.*, 538 F. App'x at 181. First, although Hyman's actions until June 24, 2012 (when Plaintiff says he first discovered the construction that Hyman had undertaken) may have been "unexpected" by Plaintiff,[2] they were not "unintended" by Hyman. To the contrary, as evidenced by the engineer's report that Hyman commissioned, the demolition and construction Hyman performed was carefully planned. Beyond that, as to any demolition and construction that Hyman completed after Plaintiff looked through the window of the house in June 2012, such was not "unexpected" by Plaintiff because he was well aware of it. As he explained in his deposition testimony, Plaintiff knowingly then gave Hyman the opportunity (if not directive) to restore the house after he (Plaintiff) discovered the initial damage. ECF No. 84-1 at 24:6-24:13. Thus,

---

[1] The Court notes that its discussion is limited to the demolition that Hyman undertook. However, considering any further construction work that occurred over even a longer period of time would only bolster the Court's conclusion that no reasonable jury could find that the damage claimed here was "sudden."

[2] In his deposition testimony, Hyman asserts that he "told [Plaintiff] [he] was going to completely renovate the house after there was structural damage" and that "[Plaintiff] knew all the work that was going to be done." ECF No. 84-2 at 42:19-42:21, 42:18- 42:19. Plaintiff, however, denies that he had any knowledge of the demolition before he arrived at the house on June 24, 2012. ECF No. 84-1 at 21:17-21:22. The Court must view the evidence in the light most favorable to Plaintiff, so it will assume that Plaintiff did not have prior knowledge of what Hyman intended. In any case, the Court notes that such an assumption has no bearing on its conclusion because the damage was not "accidental" regardless of whether Plaintiff was aware of it before June 2012.

considered together, none of the damage that resulted from any of Hyman's actions was "accidental." Plaintiff's loss is not covered by his insurance Policy.

Although Defendant's Motion will be granted for the foregoing reasons, the Court will also consider Defendant's other arguments as to why Plaintiff's loss is not protected by the Policy. Defendant argues that Plaintiff had a contractual obligation to report his damage to Defendant and that his failure to do so in June 2012 prejudiced Defendant. The Court agrees that Plaintiff's Policy requires him to "immediately notify" Defendant of any damage, ECF No. 37-1 at 27, and that he failed to do so. This does not end the Court's inquiry, however, because in order to deny coverage for a loss that would otherwise be covered, Defendant must show not only that Plaintiff failed to fulfill his contractual notice duty, but also that Defendant "suffered prejudice as a consequence." *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 72, 371 A.2d 193, 196 (1977).

In this case, determining whether there was prejudice to Defendant would require the Court to resolve factual issues in dispute and that it cannot do at this stage of the proceedings, based on the evidence in the record. For example, the Court would have to pinpoint when specific construction work occurred, such as what, if anything, was done to the house after June 24, 2012, how that work played into the damage claim here, and how the Defendant's position was actually and materially prejudiced in those regards. Although Hyman discusses the different phases of construction in his deposition testimony, he only speaks broadly about what occurred between January 2012 and January 2013, ECF No. 84-2 at 60:11-61:23, so such questions are left unresolved at this point. These questions of material fact cannot be resolved by the Court at the summary judgment stage. Rather, they would be questions for a jury to resolve at trial. *See, e.g., Nationwide Prop. & Cas. Ins. Co. v. Mattis*, No. 12-CV-6130, 2014 WL 1806835, at *3

(E.D. Pa. May 6, 2014). Therefore, the Court cannot grant Defendant's Motion on the ground that Defendant was prejudiced by Plaintiff's failure to immediately notify Defendant of his claimed damages.

Finally, Defendant argues that even if Plaintiff's loss was "sudden and accidental," Defendant does not have to pay for it because it is a type of loss that is specifically excluded from coverage by Plaintiff's Policy. The Policy states that Defendant will not cover losses caused by "defective, inadequate, faulty or unsound [...] design, specifications, workmanship, repair, construction, renovation, remodeling, grading, [or] compaction," among other things. ECF No. 37-1 at 22. Considering the plain and obvious meanings of these words, the Court concludes that as a matter of law, the work Hyman performed on the house unquestionably falls into many of these excluded categories, including "repair," "construction," "renovation," and "remodeling."[3] As the record plainly demonstrates, the demolition that Hyman performed is excluded because it "alter[ed] the structure of" the house, MIRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/remodel, ECF No. 84-2 at 60:14-61:23, and because it was the first step in Hyman's plan to "completely renovate" the residence, ECF No. 84-2 at 42:20, *see* ECF No. 84-2 at 60:14-61:23. Similarly, any post-demolition work that Hyman completed is excluded because it was part of his large-scale renovation project and involved fixing, restructuring, and restoring the house. ECF No. 84-2 at 60:14-61:23.

---

[3] According to Miriam-Webster's dictionary, the words "repair," "construction," "renovation," and "remodeling" are the noun forms of the verbs "repair," "construct," "renovate," and "remodel." These verbs are defined by Miriam-Webster's dictionary as follows:
    Repair: "To restore by replacing a part or putting together what is torn or broken,"
    Construct: "To make or form by combining or arranging parts or elements"
    Renovate: "To restore to a former better state (as by cleaning, repairing, or rebuilding)"
    Remodel: "To alter the structure of"
*See* MIRIAM-WEBSTER, https://www.merriam-webster.com.

Although Plaintiff argues that the exclusion does not apply here because he did not authorize Hyman's demolition, ECF No. 88 at 9-11, his argument is substantially undercut by the fact that he personally considered the work to be remodeling—Plaintiff (who happens to also be a lawyer) referred to it as "remodeling" in an e-mail to Hyman dated January 26, 2013. ECF No. 84-1 at 90. Accordingly, the Court concludes that Defendant has demonstrated that no reasonable jury could conclude other than that the exclusion as stated in the Policy applies. *See, e.g., Hamm v. Allstate Prop. & Cas. Ins. Co.*, 908 F. Supp. 2d 656, 673 (W.D. Pa. 2012) (granting summary judgment on the ground that a "Weather Conditions" exclusion applied); *Baker v. Metro. Prop. & Cas. Ins. Co.*, No. 3:12-CV-01231, 2013 WL 5308196 (M.D. Pa. Sept. 19, 2013) (granting judgment on the pleadings because a water damage exception was applicable); *Mav of Michigan, Inc. v. Am. Country Ins. Co.*, 289 F. Supp. 2d 873 (E.D. Mich. 2003) (granting summary judgment because a faulty renovation/repair/construction exception applied).

Thus, Defendant's Motion for Summary Judgment as to Count I is granted on the grounds that Plaintiff's loss was not "sudden and accidental," as required for coverage under his Policy, and that even if it were, coverage for this claim is explicitly excluded by the Policy.

### B. Bad Faith

Defendant's Motion for Summary Judgment as to Count II, the bad faith claim, is also granted. First, Plaintiff alleges a bad faith claim based in part on denial of coverage, however, "there can be no bad-faith claim [for denial of coverage] if the insurer was correct as a matter of law in denying coverage." *Cozza ex rel. Cozza v. State Farm Fire & Cas. Co.*, 440 F. App'x 73, 75–76 (3d Cir. 2011) (citing *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n. 9 (3d Cir.1999)). In this case, as explained, there is no viable breach of contract claim, so the first part of Plaintiff's bad faith claim cannot succeed. Second, Plaintiff argues that

10

Defendant acted in bad faith by failing to adequately investigate his claim. In his papers, Plaintiff lists a variety of ways in which he asserts Defendant's investigation was inadequate, including that Defendant did not conduct enough interviews to uncover the facts of the case and that Defendant did not look into allegedly stolen tiles brought into the house. ECF No. 88 at 12. Defendant however, asserts that an adequate investigation was conducted and that it included an inspection of the house, interviews of Plaintiff and Hyman, consultation with its legal counsel, and the taking of Plaintiff's Examination Under Oath. ECF No. 82 at 20. Plaintiff's claim ultimately fails because he has not cited to anything in the record to support his argument—he merely alleges problems existed without providing any record evidence to prove them. *See* ECF No. 88 at 12. Therefore, the Court concludes that "even when the record is considered in the light most favorable to [him], Plaintiff[] ha[s] not produced sufficient evidence from which a reasonable jury could find by clear and convincing evidence that [Defendant] acted in bad faith." *Hamm*, 908 F. Supp. 2d. at 673.

### IV. CONCLUSION

Defendants' Motion for Summary Judgment as to Counts I and II is granted.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: January 10, 2017

cc: All counsel of record

11